IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>RICHARD THOMPSON,<br><br>Defendant. | CRIMINAL ACTION NO.<br>1:20-cr-00438-LMM-RDC-1 |

## FINAL REPORT AND RECOMMENDATION

Before the Court is Defendant Richard Thompson's Motion to Dismiss Counts 14–24 of the Indictment, (Doc. 28). Briefing is complete, and Defendant's Motion is now ripe for review. For the reasons stated below, the undersigned respectfully **RECOMMENDS** that the Motion be **DENIED**.

## I. PROCEDURAL BACKGROUND

On November 17, 2020, Defendant was charged with the following offenses:

Counts 1–13
Defrauding his former employer, a federally licensed firearms manufacturer and dealer located in Conyers, Georgia, in violation of 18 U.S.C. § 1341.

Counts 14–24
Stealing firearms from his former employer, in violation of 18 U.S.C. § 924(m).

(Doc. 1).

On June 9, 2021, Defendant moved to dismiss certain of the latter charged

offenses, arguing that § 924(m) exceeds Congress' power under the Commerce Clause, both facially (as to Counts 14–24) and as applied to the facts of his case (as to Counts 14–20, 22, 24), because the statute does not establish a sufficient nexus to interstate commerce.[1] (Doc. 28).

## II. DISCUSSION

Defendant challenges the authority of Congress, so this discussion begins with what Congress actually said. Section 924(m) provides:

> A person who steals any firearm from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 924(m).

Defendant argues, first, that § 924(m) is unconstitutional on its face because it purports to criminalize even purely intrastate theft, a matter he maintains is beyond Congress' authority to regulate interstate commerce. In support, he relies on two

---

[1] Defendant also argues that § 924(m) violates the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." (Doc. 28 at 1, 4, 6); U.S. Const. amend. X. However, the Eleventh Circuit has held that that Congress does not violate the Tenth Amendment when it enacts legislation through the constitutionally permissible exercise of its Commerce Clause power. *See Cheffer v. Reno*, 55 F.3d 1517, 1521 (11th Cir. 1995) ("Because the [challenged legislation] is within Congress' Commerce Clause power, it does not violate the Tenth Amendment."); *see also New York v. United States*, 505 U.S. 144, 156–57 (1992) ("The Tenth Amendment likewise restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which, as we have discussed, is essentially a tautology. . . . The Tenth Amendment thus directs us to determine . . . whether an incident of state sovereignty is protected by a limitation on an Article I power."). Accordingly, Defendant's Tenth Amendment challenge stands or falls with his Commerce Clause challenge.

2

features of § 924(m)—first, it lacks a jurisdictional element requiring that the firearm(s) at issue have actually travelled in or otherwise affected interstate commerce; and second, it regulates activity—*i.e.*, intrastate theft—that is non-economic and non-commercial in nature. In short, according to Defendant, because § 924(m) encompasses activity that is neither interstate nor commercial, the statute on its face exceeds Congress' interstate commerce authority. In any event, because most of the firearms at issue in his Indictment (specifically, those described by Counts 14–20, 22, and 24) never actually traveled across state lines before the alleged theft occurred, Defendant also contends that, at a minimum, Section 924(m) is unconstitutional as applied to him. (Docs. 28, 35). In response, the Government maintains that § 924(m) constitutes a lawful exercise of Congress' authority to regulate activities having a substantial relation to interstate commerce. (Doc. 33).

### *A. Facial and As-Applied Challenges*

Defendant makes both facial and as-applied challenges to § 924(m). Before turning to the merits, it is important to clarify at the outset the type of showing required. "A facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself." *United States v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir. 2000). In other words, a facial challenge does not attack a *particular* application of a statute, but all *possible* applications. *See Jacobs v. The Florida Bar*, 50 F.3d 901, 906 n.20 (11th Cir. 1995) ("[W]hen a plaintiff attacks a law facially,

3

the plaintiff bears the burden of proving that the law could never be constitutionally applied."). It is "the most difficult challenge to mount successfully" because it requires a defendant to show "that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Frandsen*, 212 F.3d at 1235 (stating that "no set of circumstances" is the general rule for evaluating facial challenges in the Eleventh Circuit).

Because there are applications of § 924(m) that would clearly be constitutional—for instance, as applied to the theft of firearms that *actually* traveled in interstate commerce—Defendant's facial challenge cannot succeed. *See Salerno*, 481 U.S. at 745; *Frandsen*, 212 F.3d at 1235. The alleged infirmity with § 924(m) is that the statute is overbroad, prohibiting the theft of firearms without any interstate nexus. But insofar as such a nexus *in fact* exists—again, for example, if a stolen firearm has moved across state lines—the infirmity dissolves. Defendant does not argue otherwise. Indeed, Defendant implicitly concedes as much. His as-applied challenge identifies no constitutional trouble with respect to those firearms (specifically, those described in Counts 21 and 23) that admittedly traveled across state lines. *See* (Doc. 28 at 5–6). Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion to Dismiss be **DENIED** as to his facial challenge.

So, that leaves only Defendant's as-applied challenge. Importantly, when a statute is challenged as exceeding Congress' interstate commerce authority,

4

reviewing courts are limited to rational-basis review only. *Gonzalez v. Raich*, 545 U.S. 1, 22 (2005) ("In assessing the scope of Congress' authority under the Commerce Clause, we stress that the task before us is a modest one. We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding."); *Montgomery Cnty. Comm'n v. Federal Housing Fin. Agency*, 776 F.3d 1247, 1258 (11th Cir. 2015) ("Evaluating a statute's validity [under the Commerce Clause] requires this Court to determine only whether Congress had a rational basis for determining the regulated activity substantially affects interstate commerce.").

Accordingly, the specific question before the Court—which appears to be one of first impression—is whether Congress, in enacting § 924(m), had a rational basis to conclude that the intrastate theft of firearms substantially affects interstate commerce. The answer is yes.

### B. Commerce Clause

Under the Commerce Clause, "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Using its interstate commerce power, Congress can regulate: (1) the "channels of interstate commerce"; (2) "instrumentalities," people, and "things in interstate commerce"; and (3) "activities that substantially affect interstate commerce." *United States v.*

5

*Lopez*, 514 U.S. 549, 558–59 (1995); *United States v. Morrison*, 529 U.S. 598, 608–09 (2000). The parties agree that Congress' authority as relevant to this case, should it exist, derives from the third category.[2]

The Supreme Court has held that "activities in this third category—those that 'substantially affect' commerce—may be regulated so long as they substantially affect interstate commerce in the aggregate, even if their individual impact on interstate commerce is minimal." *Taylor v. United States*, 136 S.Ct. 2074, 2079 (2016) (citing *Wickard v. Filburn*, 317 U.S. 111, 125 (1942) ("[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce.")); *see also Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258 (1964) ("[I]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." (quotation and citation omitted)).

Broad as it is, this third category is not without limit. Local intrastate activity may only be reached under the Commerce Clause if the activity at issue is itself

---

[2] The undersigned recognizes that these categories "do not carve the commerce power into three neat slices, but simply represent an effort to synthesize more than a century of Commerce Clause enactments by grouping them in loose categories that are decidedly descriptive, rather than definitional. Consequently, it is often the case that more than one category will accommodate a given piece of legislation." *United States v. Peters*, 403 F.3d 1263, 1271 n.1 (11th Cir. 2005). However, because the parties agree that the third category applies here, the undersigned does not consider whether § 924(m) might fall under another category.

deemed to be "economic," *see Lopez*, 514 U.S. at 561, or an "essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated," *Raich*, 545 U.S. at 24 (quoting *Lopez*, 514 U.S. at 561). To hold otherwise, the Supreme Court has explained, would blur the line "between what is truly national and what is truly local." *Lopez*, 514 at 567–68.

In his challenge to § 924(m), Defendant attempts to draw a close analogy between his case and *Lopez* and *Morrison*, two cases in which the Supreme Court invalidated statutes as beyond the third category of Congress' interstate commerce authority. However, it is a successor case—namely, *Raich*—that is most congruent and, therefore, controls. Given the import of these cases, this discussion can profitably reach the merits by first reviewing each decision, in turn.

In *Lopez*, the defendant challenged his conviction under the Gun-Free School Zones Act, which criminalized the possession of a firearm in school zones. 514 U.S. at 551–52. While affirming Congress' extensive authority to regulate activities substantially affecting interstate commerce, the Court nevertheless held that the regulation of gun possession in school zones stood outside the bounds of that authority. *Id.* at 567–68. The Court explained that the statute contained no jurisdictional element to ensure that the conduct in question actually implicated interstate commerce. *Id.* at 561. Moreover, according to the Court, "the possession

7

of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at 567. Finally, the statute itself had "nothing to do with 'commerce' or any sort of economic enterprise," nor was it "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* at 561. To find the requisite connection to interstate commerce under these circumstances, the Court concluded, would require it "to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.* at 567. Cautious of that outcome, the Court invalidated the statute. *Id.* at 567–68.

*Morrison* clarified the holding of *Lopez*. In *Morrison*, a university student brought civil claims under the federal Violence Against Women Act against several students who allegedly raped her. 529 U.S. at 604–05. But the Court invalidated the statute as exceeding the scope of Congress' authority to regulate under the third category of its interstate commerce authority. *Id.* at 617–19. The Court explained that, "in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor." *Id.* at 611. However, in the Court's opinion, "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." *Id.* at 613. Notably, as was the case in *Lopez*, the statute

at issue did not include a jurisdictional element. *Id.* Absent an express jurisdictional hook, and given the non-economic nature of the regulated conduct, the Court struck down the statute by "reject[ing] the argument that Congress may regulate . . . conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617. Aggregated effects alone, in other words, cannot rescue a statue under the Commerce Clause.

Finally, *Raich* added further color. That case addressed the question of whether the Controlled Substances Act (CSA), which prohibited the manufacture, distribution, and possession of controlled substances, was unconstitutional as applied to purely intrastate producers of marijuana. 545 U.S. at 5. The respondents, who grew marijuana only for personal consumption, argued that their conduct was non-economic and purely intrastate and, for that reason, beyond Congress' interstate commerce power. *Id.* at 6–7. The Court disagreed.

"What the Court found important, and what distinguished *Raich* from *Morrison* and *Lopez* . . . was the comprehensiveness of the economic component of the regulation." *United States v. Maxwell*, 446 F.3d 1210, 1214 (11th Cir. 2006). Notably, the statutory provision at issue in *Raich* did not include a jurisdictional element. However, the CSA did more than simply address the possession of a firearm in certain geographic locations or target gender-motivated crimes of violence, like the statutes in *Lopez* and *Morrison*. Instead, the CSA was far more

9

robust—it established "a comprehensive regime to combat the international and interstate traffic in illicit drugs." 545 U.S. at 12. As the Court explained, "a primary purpose of the CSA [wa]s to control the supply and demand of controlled substances in both lawful and unlawful drug markets." *Id.* at 19. Moreover, even the local cultivation of marijuana could have the effect of diverting drugs into illicit channels and thereby frustrate the federal interest in regulating the interstate market in its entirety. *Id.* For that reason, the Court concluded, the regulation fell "squarely within Congress' commerce power because production of the commodity meant for home consumption . . . ha[d] a substantial effect on supply and demand in the national market for that commodity." *Id.*

The upshot after *Raich* is that "Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Id.* at 18; *Maxwell*, 446 F.3d at 1215 ("[W]here Congress has attempted to regulate (or eliminate) an interstate market, *Raich* grants Congress substantial leeway to regulate purely intrastate activity (whether economic or not) that it deems to have the capability, in the aggregate, of frustrating the broader regulation of interstate economic activity."). In other words, "[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." *Raich*, 545

U.S. at 23 (quotation and citation omitted).

With the preceding in mind, the undersigned concludes that Congress' prohibition on the intrastate theft of firearms under § 924(m) is a valid exercise of its interstate commerce authority. While Defendant points out that § 924(m) does not include a jurisdictional element, that alone is not dispositive. *See United States v. Moghadam*, 175 F.3d 1269, 1275–76 (11th Cir. 1999) ("[T]he absence of such a jurisdictional element connecting the offense to interstate or foreign commerce does not necessarily mean the Commerce Clause cannot serve as authority."); *United States v. Olin Corp.*, 107 F.3d 1506, 1510 (11th Cir. 1997) ("[A]lthough Congress did not include in CERCLA either legislative findings or a jurisdictional element, the statute remains valid as applied in this case because it regulates a class of activities that substantially affects interstate commerce.").

To put the matter plainly, this is a *Raich* case.[3] Just as in *Raich*, where the statute under consideration also lacked a jurisdictional element, Defendant here challenges a component of a comprehensive regulatory scheme governing the national market in a commodity—in this case, firearms. And the subject of the regulatory scheme is decidedly economic, which in this context refers broadly, per the Supreme Court in *Raich*, to "the production, distribution, and consumption of

---

[3] Because the undersigned concludes that *Raich* controls, the ensuing discussion is guided by the Supreme Court's analysis in that case. *See Maxwell*, 446 F.3d at 1216 n.6.

commodities." 545 U.S. at 25.

Section 924(m) was enacted as part of the Violent Crime Control and Law Enforcement Act of 1994, which, among other things, imposed enhanced penalties for certain firearms offenses. Pub. L. No. 103-322, § 110515, 108 Stat. 1796. The underlying statutory framework was laid down with passage of the Omnibus Crime Control and Safe Streets Act of 1968, which established federal licensing requirements and other regulations on the nationwide traffic in firearms. Pub. L. No. 90-351, 82 Stat. 197. Section 901(a) of the Omnibus Act declared "that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power." *Id.* § 901(a)(1). Moreover, Congress determined "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all *persons engaging in the business of importing, manufacturing, or dealing in them,* can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible." *Id.* § 901(a)(3) (emphasis added).

As it did with controlled substances, Congress has for the last several decades erected a comprehensive regulatory framework "to control the supply and demand of [firearms] in both lawful and unlawful . . . markets." *Raich*, 545 U.S. at 19. And

12

that being so, to borrow (with minimal revision) the Supreme Court's own pronouncement in *Raich*, "[p]rohibiting the intrastate [theft] of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." *Id.* at 26. In other words, Congress could have rationally determined that intrastate theft would undermine its comprehensive regulation of the national firearms market. That alone is reason enough to sustain § 924(m). *See id.* at 19.

Nevertheless, against the broad understanding of economic activity articulated by the Supreme Court, Defendant argues that the specific regulated activity at issue—namely, intrastate theft—is non-economic. The problem with § 924(m), according to Defendant, is that it "prohibits the local theft of a firearm, which is a non-economic or commercial activity." (Doc. 28 at 5). Therefore, Defendant continues, like the regulated activities at issue in *Lopez* and *Morrison*, the intrastate theft of firearms cannot be aggregated to measure up to the substantial effects required under the third category of Congress' interstate commerce authority. The undersigned disagrees.

Property crimes—such as theft, burglary, or robbery—effect an economic transfer, albeit an involuntary one. The criminal makes an economic gain, and the victim suffers an economic loss. *See United States v. Gray*, 260 F.3d 1267, 1274 (11th Cir. 2001) ("Robbery, even though accompanied by actual or threatened physical harm, is undeniably an *economic* crime that involves the involuntary

13

transfer of economically valuable assets." (emphasis in original)); *United States v. Walker*, 657 F.3d 160, 179 (3rd Cir. 2011) ("Although drawing the line between 'economic' and 'non-economic' activities may sometimes be difficult, property crimes like robbery and extortion are—unlike the possession of a gun in a school zone [in *Lopez*] or gender-motivated violence [in *Morrison*]—indisputably 'economic' . . . ."). Indeed, the Federal Sentencing Guidelines categorize property offenses like theft, burglary, and robbery as "Basic *Economic* Offenses." U.S.S.G. ch. 2, pt. B. (emphasis added).

In any event, as alluded to above, the relationship between theft and commerce is "clear, direct, and unattenuated." *Gray*, 260 F.3d at 1274. As a starting point, under the third category of its interstate commerce authority, Congress may regulate the national firearms market based on the aggregate effect on interstate commerce—that much is uncontested. *See Maxwell*, 446 F.3d at 1217 (upholding Congress' authority to criminalize the receipt, distribution, sale, production, possession, solicitation, and advertisement of child pornography because such regulation "is just as valid an exercise of the Commerce Clause authority as price and volume controls of an otherwise legal market"). And with respect to that overarching interstate market, the theft of firearms from licensed parties—even when purely local—is largely zero-sum. It removes commodities from one market (a legal one) while supplying another (an illegal one). *See United States v. Hosford*, 843 F.3d 161, 171–72 (4th Cir. 2016)

14

("[L]ike the market for marijuana, Congress has a rational basis to believe that leaving intrastate firearm markets unregulated would affect the interstate market or draw firearms purchased intrastate into the interstate market.").

From this, "it follows that Congress may . . . regulate intrastate [firearms] *theft*." *Taylor*, 136 S.Ct. at 2077 (emphasis in original). The reason being that, as just described, theft directly brings about an economic, supply-side transfer of firearms between legal and illegal markets that is unquestionably subject to Congress' reach. *See Raich*, 545 U.S. at 18; *Hosford*, 843 F.3d at 171–72. Congress could thus rationally conclude that failure to regulate even intrastate theft from licensed parties "would undercut the regulation of the interstate market" in firearms. *Raich*, 545 U.S. at 18; *see also United States v. Luna*, 165 F.3d 316, 321 (5th Cir. 1999) ("[T]he regulation of stolen firearms is 'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless . . . intrastate activity were regulated.'" (citation omitted)). And binding precedent "firmly establishes" Congress' authority to regulate even purely local activities—such as Defendant's alleged intrastate firearms theft—insofar as they are part of a class of activities that, when considered as a whole under a comprehensive market regulation, have a substantial effect on the targeted market. *Raich*, 545 U.S. at 17.

Accordingly, given the economic nature of property crimes like theft and the direct link between such crimes and the interstate firearms market subject to

15

Congress' comprehensive regulation, contrary to Defendant's urging, cases like *Lopez* and *Morrison* are "wholly inapposite" here. *Gray*, 260 F.3d at 1274. The undersigned thus **RECOMMENDS** that Defendant's Motion to Dismiss also be **DENIED** as to his as-applied challenge.

### III. CONCLUSION

For all of the reasons presented above, the undersigned **RECOMMENDS** that Defendant's Motion to Dismiss Counts 14–24 of the Indictment, (Doc. 28), be **DENIED**. Because there are no other pretrial motions related to Defendant Richard Thompson pending before the undersigned, his case is **CERTIFIED READY FOR TRIAL**.

IT IS SO **RECOMMENDED** on this 24th day of August 2021.

*/s/ R. Cannon*
REGINA D. CANNON
United States Magistrate Judge